Richard ATKINSON, Appellant,

v.

DISTRICT OF COLUMBIA BOARD
OF ELECTIONS AND ETHICS,
Appellee.

Rev. Albert Gallmon, Jr. & Committee
for Strict Liability, Intervenors.

No. 91–688.

District of Columbia Court of Appeals.

Argued Sept. 12, 1991.
Decided Sept. 20, 1991.

John F. Dienelt, with whom Carl T. Rowan, Jr., Alexander P. Starr and Jerome D. Pinn, were on the brief, for appellant.

William H. Lewis, with whom Alice P. Miller, was on the brief, for appellee.

David A. Clarke, with whom Joshua M. Horwitz, was on the brief, for intervenors.

John Payton, Corp. Counsel, Charles L. Reischel, Deputy Corp. Counsel, and Lutz

Alexander Prager, Asst. Deputy Corp. Counsel, filed a brief, for the District of Columbia, as amicus curiae.

Before FERREN and STEADMAN, Associate Judges, and GALLAGHER, Senior Judge.

STEADMAN, Associate Judge:

Before us for expedited decision is a challenge to a proposed referendum measure to be submitted in November to the voters of the District of Columbia relating to potential liability of manufacturers, importers, and dealers of assault weapons for injury or death caused by the use of such a weapon in the District. Its disposition involves consideration of a unique feature of the legislative process in the District; namely, that a legislative act of the Council of the District of Columbia, with certain exceptions, may not take effect until at least thirty calendar days after the act has been formally transmitted to Congress, within which period Congress may, by joint resolution, disapprove the Act. D.C.Code § 1–233(c)(1) (1987).[1] We affirm the decision of the trial court dismissing appellant's challenge to the referendum and its proposed wording on the ballot.

---

**1.** The precise relevant statutory language reads: [T]he Chairman of the Council shall transmit to the Speaker of the House of Representatives and the President of the Senate, a copy of each act passed by the Council and signed by the Mayor ... [S]uch act shall take effect upon the expiration of the 30–calendar–day period (excluding Saturdays, Sundays, and holidays, and any day on which neither House is in session because of an adjournment sine die, a recess of more than 3 days, or an adjournment of more than 3 days) beginning on the day such act is transmitted by the Chairman to the Speaker of the House of Representatives and the President of the Senate, or upon the date prescribed by such act, whichever is later, unless during such 30–day period, there has been enacted into law a joint resolution disapproving such act.

**2.** The operative section of that act provides: "Any manufacturer, importer, or dealer of an assault weapon shall be held strictly liable in tort, without regard to fault or proof of defect, for all direct and consequential damages that arise from bodily injury or death if the bodily injury or death proximately results from the discharge of the assault weapon in the District of Columbia." Sec. 4. The act also defines the phrase "assault weapon." Sec. 3(1).

## I

On December 17, 1990, then Mayor Marion Barry, Jr., approved, pursuant to D.C.Code § 1–227(e), Act 8–289 (the "1990 Act") of the Council of the District of Columbia, entitled the "Assault Weapon Manufacturing Strict Liability Act of 1990."[2] On January 11, 1991, the act was submitted to Congress pursuant to D.C.Code § 1–233(c)(1). By appellant's own calculation, the 30–calendar–day congressional layover period would, in the normal course of events, expire on or about March 6, and the act then "take effect."

However, on February 5, 1991, the newly elected Council, following a recommendation by newly elected Mayor Sharon Pratt Dixon, took the first of three steps to repeal the 1990 Act by unanimous passage, pursuant to its power to enact emergency legislation under D.C.Code § 1–229(a),[3] of Act 9–1, the "Assault Weapon Manufacturing Strict Liability Act of 1990 Emergency Repealer Act of 1991." Mayor Dixon approved this emergency legislation on February 15, 1991, and it went into immediate effect "for no longer than 90 days."[4]

Secondly, on March 5, 1991, the Council passed Act 9–8, the "Assault Weapon Man-

---

**3.** The operative portion of § 229(a) provides: "If the Council determines, by a vote of two-thirds of the members, that emergency circumstances make it necessary that an act be passed after a single reading, or that it take effect immediately upon enactment, such act shall be effective for a period of not to exceed 90 days." Section 233(c)(1) expressly excludes such emergency legislation from the requirement of presentation to Congress before a Council act may take effect. *See District of Columbia v. Washington Home Ownership Council, Inc.,* 415 A.2d 1349 (D.C.1980) (en banc).

**4.** The full text of Act 9–1 read:

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Assault Weapon Manufacturers Strict Liability Act of 1990 Emergency Repealer Act of 1991".

Sec. 2 The Assault Weapon Manufacturing Strict Liability Act of 1990, signed by the Mayor on December 17, 1990 (D.C.Act 8–289, to be codified at D.C.Code, sec. 6-2391), is repealed.

Sec. 3 This act shall take effect upon its enactment (approval by the Mayor, or in the event of veto by the Mayor, override of the

ufacturing Strict Liability Act of 1990 Temporary Repealer Act of 1991," which repealed the 1990 Act "on a temporary basis" for another 225 days.[5] The Mayor signed Act 9–8 on March 15, 1991, and it was transmitted to Congress pursuant to D.C.Code § 233(c)(1) on March 19, 1991. The congressional layover period having expired, the Temporary Repealer Act took effect on May 15, 1991.

Finally, the Council passed permanent legislation, repealing the 1990 Act, denominated as Act 9–32 and entitled the "Assault Weapon Manufacturing Strict Liability Act of 1990 Repealer Act of 1991." Approved by the Mayor on May 17, Act 9–32 was transmitted to Congress on May 23, 1991.

On that same day, action began under another aspect of the District's legislative process; namely, the voters' right to a referendum.[6] Intervenor-appellee Gallmon submitted a proposed referendum measure with the District of Columbia Board of Elections and Ethics (the "Board"). The proposed referendum measure would put to the voters the question whether Act 9–32, the permanent repeal of the 1990 Act, should be adopted or disapproved. On May 28, 1991, the Board determined that the proposal met the standards for a referendum, adopted a short title and summary statement, and designated it as "Referendum Measure No. 006." The Board approved the petition form on June 11, 1991,[7] and the solicitation of the necessary elector signatures (five per cent of all registered electors, D.C.Code § 1–282(a)) began in an effort to place the referendum measure on the ballot. On July 12, 1991, a referendum petition with the requisite number of signatures was presented to the Board, and on August 6, 1991, the Board certified the referendum measure for inclusion on a November 5 special election ballot. A further consequence of these actions was to halt the congressional layover process for Act 9–32 (the permanent repealer), pursuant to D.C.Code § 1–282(b)(1).[8]

veto by the Council) and shall remain in effect for no longer than 90 days, as provided for emergency acts of the Council of the District of Columbia in section 412(a) of the District of Columbia Self–Government and Governmental Reorganization Act, approved December 24, 1973 (87 Stat. 788; D.C. Code, sec. 1–229(a)).

5. Such "temporary" legislation is the product not of statute but of a Council rule: "If the Council finds the existence of an emergency and approves an emergency bill under section 412, the Council may, at the same legislative session, consider a temporary bill on first reading without committee referral. The temporary bill must be substantially similar to the emergency bill and may remain effective for not more than 225 days." RULES OF ORGANIZATION AND PROCEDURE FOR THE COUNCIL OF THE DISTRICT OF COLUMBIA, COUNCIL PERIOD IX, Rule 413 (1991), reprinted following D.C.Code § 1–227 (1991). This practice was developed to fill a potential "gap" period between emergency legislation and permanent legislation, necessitated by limitations on the ability of the Council to pass successive emergency bills. *See United States v. Alston,* 580 A.2d 587, 590–91 (D.C.1990).

6. This right of referendum, as well as that of initiative, was added to the basic governmental statute of the District of Columbia, the Home Rule Act, in 1978. D.C.Code §§ 1–281 to 287. *See Atchison v. District of Columbia,* 585 A.2d 150, 154–55 (D.C.1991). The term "referendum" is defined as "the process by which the reg-

istered qualified electors of the District of Columbia may suspend acts of the Council of the District of Columbia (except emergency acts, acts levying taxes, or acts appropriating funds for the general operation budget) until such acts have been presented to the registered qualified electors of the District of Columbia for their approval or rejection." § 1–281. If the voters approve the act as passed by the Council, then the act becomes law subject to the submission to Congress under § 233(c)(1). If the voters disapprove the act, "such action shall be deemed a rejection of the act … and no action may be taken by the Council of the District of Columbia with regard to the matter presented at referendum" for a year thereafter. § 1–284. Enabling legislation covering in detail the entire referendum process appears in D.C.Code § 1–1320.

7. The procedures that must be followed to entitle a referendum proposer to solicit elector signatures for a referendum measure are set forth in D.C.Code § 1–1320.

8. That subsection reads: "Upon the presentation of a petition for a referendum to the District of Columbia Board of Elections and Ethics as provided in this section, the District of Columbia Board of Elections and Ethics shall notify the appropriate custodian of the act of the Council of the District of Columbia (either the President of the United States or the President of the Senate and the Speaker of the House of Representatives) as provided in §§ 1–227 and 47–304

Meanwhile, shortly following the Board's acceptance of the referendum proposal on May 28, 1991, appellant filed a petition with the Superior Court challenging both the acceptance of the proposal as a referendum and the language of the summary statement.[9] The trial court rejected appellant's challenges and dismissed the petition. This appeal followed.

## II

Appellant's first argument is that the referendum proposal is fatally defective because it is in fact an initiative. His argument rests upon the proposition that by the enactment of the emergency repealer act, Act 9–1, the Council "nullified" the 1990 Act which was still pending before Congress.[10] He argues that "logic and common sense, as well as the purpose of the Home Rule Act," dictate such an interpretation. He asserts that an act passed by the Council, while still pending before Congress, does not have permanent duration, since it will eventually either come into law (that is, take effect) or be disapproved. Because acts do not have permanent duration, he says, it does not take a permanent law to repeal them permanently, but only a temporary law, such as an emergency act. In substance, he argues that the Council has the power to withdraw its own acts before the congressional layover period has passed and has exercised that power by enacting the emergency repealer act.

■ We find nothing in either the straightforward and clear provisions of the legislative processes established by the Home Rule Act or the steps taken by the Council to deal with the 1990 Act which would warrant a holding that by passage of the emergency repealer act, the Council permanently and without more deprived the 1990 Act of legal effect.

The Home Rule Act vests the legislative power granted to the District in the Council, to be exercised in accordance with the Act. In general, within the District government, this legislative power is exercised in a manner similar to that common in the states. The Council passes legislation and submits it to the Mayor. The Mayor has 10 days within which to approve or disapprove the act, and if disapproved, the Council may by a two-thirds vote override the veto. D.C.Code § 1–227(e).

■ As indicated above, however, District legislation is, with certain exceptions, subject to the further requirement that it shall be "transmitted" to Congress. However, this is not a transmittal for any affirmative action by Congress. On the contrary, unless Congress within the designated period "disapproves" the act by joint resolution (which requires the President's signature),[11] the act "shall take effect"

and the President of the United States or the President of the Senate and the Speaker of the House of Representatives shall, as is appropriate, return such act or portion of such act to the Chairman of the Council of the District of Columbia. No further action may be taken upon such act or portion of such act until after a referendum election is held."
Once an act becomes law it is no longer subject to referendum. D.C.Code § 1–282(b)(2). No question is raised as to the timeliness of the submission of the petition or compliance with § 1–282(b)(1).

9. The jurisdictional basis asserted in the petition was D.C.Code § 1–1320(e), which provides: "If any registered qualified elector of the District of Columbia objects to the summary statement, short title or legislative form of the ... referendum measure formulated by the Board ... that person may seek review ... stating his or her objections and requesting appropriate changes." Serious doubt might exist whether appellant's first challenge, standing alone,

would be encompassed by this provision. However, we must consider the underlying issue presented by his first argument, whether the passage of the emergency legislation nullified the 1990 Act, in order to completely dispose of the challenge to the language of the summary statement that the referendum if passed would keep the 1990 Act in effect. On this basis and to this extent, we address both arguments raised by appellant.

10. Thus, since there is no longer any extant 1990 Act, the attempt by the referendum to defeat the repealer, and thereby leave intact the 1990 Act, is in actuality an attempt to re-enact the 1990 Act, and hence it is an initiative. So goes the argument on the initiative aspect.

11. D.C.Code § 1–233(c)(1) provides that if within the thirty-day period, Congress has passed the joint resolution but it has not yet been signed by the President, the resolution, upon becoming law, "shall be deemed to have repealed such act, as of the date such resolution becomes law."

upon the expiration of the designated period or upon the effective date prescribed by the act, whichever is later. In short, once the act has been transmitted to Congress, the legislative process of the District insofar as the Council and Mayor are concerned is at an end. Under the statutory provisions, the only circumstances that can prevent the act from becoming law are the passage of a joint resolution by Congress under D.C.Code § 1–233(c)(1) or the filing of a valid referendum petition under D.C.Code § 1–282(b)(1).[12]

■ Furthermore, even if the Council has the power to prevent the processes of D.C.Code § 1–233(c)(1) from continuing in accordance with its terms, either by withdrawing the act from further congressional consideration, with or without the consent of Congress,[13] or by other means, the Council's actions here indicate not an attempt to withdraw its previous act but to repeal it. The actions all reflect a faithful adherence to the express statutory provisions in which the enactment of the 1990 Act is treated as a discrete event. The subsequent three measures enacted in 1991 all speak in terms of "repeal."

It would seem a tortured distortion of ordinary language to construe an emergency repeal act, which by its own terms is effective for only 90 days, to have the effect of nullifying on a permanent basis a Council act itself intended to be permanent. *Cf. In re O.M.*, 565 A.2d 573 (D.C.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 1824, 108 L.Ed.2d 953 (1990) (emergency legislation intended to amend interstate compact or restrict its enforcement expires at end of ninety days and has no effect on compact

terms thereafter). Furthermore, no provision is made in the statutory scheme for any formal notification to Congress of the passage of emergency legislation, which takes effect without a congressional layover. Where action subsequent to the submission of an act to Congress is intended to affect a Council act pending before Congress, as with the filing of a referendum petition, *see supra* note 8, the statutory scheme makes specific provision for such notification. If emergency legislation repealing a pending act were intended permanently to nullify a Council act pending before Congress, orderly process would anticipate a similar legislative provision for notifying Congress.[14]

■ We conclude that Act 9–1, the emergency repealer act, did not nullify the 1990 Act, and thus that Act 9–32, the "Assault Weapon Manufacturing Strict Liability Act of 1990 Repealer Act of 1991," is, as the Board and trial court found, a proper matter for referendum.[15]

### III

■ Appellant's second argument is that even if the proposed referendum is proper in principle, the "summary statement" contained in the proposed submission to the voters "contains false and misleading language as to its effect." We turn to this issue.

Pursuant to D.C.Code § 1–1320(c)(1), when the Board of Elections and Ethics accepts a referendum measure, it shall "[p]repare a true and impartial summary statement, not to exceed 100 words ...

---

12. In addition, of course, Congress may exercise its overriding power to enact "legislation for the District on any subject, whether within or without the scope of legislative power granted to the Council by [the Home Rule Act], including legislation to amend or repeal any law in force in the District...." D.C.Code § 1–206. *See* U.S. Const. art. I, § 8, cl. 17 ("The Congress shall have power ... to exercise exclusive Legislation in all Cases whatsoever, over such District").

13. Such caselaw as has been cited to us in the somewhat analogous area of attempts by legislatures to withdraw a bill passed by the legislature and pending before a state governor suggests

that the consent of the governor may be necessary. *See, e.g., Anderson v. Atwood,* 273 Mich. 316, 262 N.W. 922 (1935).

14. Appellant's broad policy argument that Congress ought not to have to concern itself with a pending act that the Council does not want to become law does not take into account the statutory language, the actual form of the actions taken by the Council, or the electorate's right of referendum.

15. No one has questioned the propriety of the underlying substantive provisions of the referendum measure.

expressing the purpose of the measure. Such statement shall not intentionally create prejudice for or against the measure." The summary statement proposed by the Board reads in its entirety as follows:

> In 1990, the Council enacted the Assault Weapons Manufacturing Strict Liability Act ("Strict Liability Act"), to hold manufacturers, importers, and dealers of certain assault weapons strictly liable for injuries caused by those weapons.
>
> In 1991, the Council passed a repeal of this law.
>
> Referendum # 006, if approved, would preserve the "Strict Liability Act" as originally passed and reject this repeal. Vote "FOR" Referendum # 006 to keep the "Strict Liability Act" in effect (and reject the repeal).
>
> Vote "AGAINST" Referendum # 006 to permit the repeal to become law.

Appellant's argument is that the Strict Liability Act has yet to complete the congressional layover period, on the theory, in effect, that the 1991 emergency act and its two successors have "tolled" the running of the mandatory thirty-day period. Hence, he asserts, the summary misleads voters into believing that the Strict Liability Act already is "law" and that they can vote "to keep" it "in effect"; that is, it implies that a successful vote to reject the permanent repealer (a majority of "FOR" votes) will *ipso facto* render the 1990 Act an operative law. The contrary argument is made, however, that the summary statement makes no such assertion, but to the contrary simply avers that a FOR vote will keep the "Act" in effect with whatever force it will then have absent the permanent repealer statute.[16]

We see no basis for taking issue with the Board's formulation of the summary statement or the trial court's conclusion that the language was "sufficiently accurate and informative" fairly to inform the voters of the "purpose of the measure." D.C.Code § 1–1320(c)(1) The Board was faced with no small task in encompassing, within the statutory limit of 100 words, an impartial presentation of the relevant information to readers not necessarily schooled in the subtleties of the District of Columbia legislative process.[17] As the Board's counsel told the trial court: "What we try to do as an impartial agency is to formulate language that is going to be friendly to the electorate as a whole. And so what we attempt to do is eliminate as much legalese as possible." The statute places upon the Board the responsibility of carrying out the mission of preparing an appropriate summary statement, and we affirm its product here.

■ The most fundamental difficulty with appellant's argument, however, is that it is based on a faulty premise: that the 1991 repealer acts have legally affected the process of congressional layover for the 1990 Act. Appellant offers no statutory or case foundation for this assertion, and we find none in the statutory scheme. As described above, the 1990 Act and the three 1991 repealer acts have operated on different tracks. The 1990 Act was submitted to Congress under a provision that unless disapproved by joint resolution, the act "shall" become law after the designated layover period had expired. D.C.Code § 1–233(c)(1). Only a referendum petition could halt this process. Moreover, even if a "withdrawal" of the 1990 Act could be effected by the Council, it did not purport to do so.[18]

The Council did, however, pass the emergency repealer. It followed that act with the 225–day temporary repealer, which took effect at the end of the congressional layover period on May 15, 1991. By all

---

**16.** Thus, by this analysis, the language would be proper whether or not the passage of the 1991 repealer acts "tolled" the period of congressional layover.

**17.** We note that the statement of facts relating to this litigation occupies over four pages of this opinion and many hundreds of words.

**18.** As already noted, the Council followed the normal route of passing legislation to repeal prior legislation. Moreover, no official notification of the passage of the 1991 emergency repeal was transmitted to Congress, and the statutorily designated period for the pendency of the 1990 Act had expired (on March 6, 1991) by the time the temporary repeal measure was transmitted to Congress on March 19, 1991.

accounts, the temporary repealer will remain in effect until well after the results of the referendum election become clear. In the event that the referendum succeeds in negating the permanent repealer, the referendum result will be subject to the temporary repealer until it expires.

In this posture, we think the trial court was quite correct in its conclusion that "the Strict Liability Act is in effect but for the repealer. The Congressional review period has passed." [19] [Tr. 39] Hence, even under appellant's reading of the purport of the language of the summary statement, it is "true and impartial." D.C.Code § 1–1320(c)(1).

The trial court's order dismissing appellant's petition is, accordingly,

*Affirmed.*

**19.** We would clarify only by noting again the remaining life of the temporary repealer.