Jay HESSEY, Appellant,

v.

Valerie K. BURDEN, Chairperson, District of Columbia Board of Elections and Ethics, et al., Appellees,

James Durham, et al., Intervenors.

Kenneth PRICE, et al., Appellants,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS AND ETHICS, Appellee,

Jay Hessey, Intervenor.

Nos. 92–CV–126, 92–CV–172.

District of Columbia Court of Appeals.

Argued April 23, 1992.
Decided Oct. 27, 1992.
As Amended Dec. 29, 1992.

Carol R. Golubock, with whom Katherine A. Meyer, Washington, D.C., was on the brief, for appellant in No. 92–126 and intervenor in No. 92–172.

Vincent Mark J. Policy, Washington, D.C., for intervenors in No. 92–126 and appellants in No. 92–172.

William H. Lewis, with whom Alice P. Miller, Washington, D.C., was on the brief, for appellees.

Before TERRY, FARRELL and WAGNER, Associate Judges.

TERRY, Associate Judge:

This case comes before this court for a second time on the question of whether the proposed Taxpayers' Right to Know Act qualifies as a "proper subject of initiative" under D.C.Code § 1–1320(b) (1992). In *Hessey v. Burden*, 584 A.2d 1 (D.C.1990) (*"Hessey I"*), we considered two challenges to the proposed initiative—the only two that were before us—and reversed a trial court decision sustaining those challenges. Now, after further proceedings, the case is here once again. On this second appeal we must first untangle the procedural knots in which the parties, including the Board, have ensnared this case. We then turn to questions of standing and ripeness. Finally, after considering the merits, we hold that the trial court erred in ruling that the proposed Taxpayers' Right to Know Act is not a proper subject of initiative. We therefore reverse in part the trial court's decision in No. 92–126, and we remand No. 92–172 to the trial court for an evaluation of whether the Board of Elections' summary statement, short title, and legislative form are proper.

## I. FACTUAL BACKGROUND

If enacted, the proposed Taxpayers' Right to Know Act ("the Taxpayers' Act") would create a new Office of Public Advocate for Assessments and Taxation (OPA). The OPA would have the authority to appear and advocate on behalf of the public interest in tax assessment proceedings before the Board of Equalization and Review (BER) and in challenges to BER determinations before the Superior Court and this court. The initiative would also require that all meetings of the BER, including individual appeals of property tax assessments, be open to the public, and it would guarantee public access to all documents presented at such meetings. In addition, the initiative would provide:

> [A]ny taxpayer may, on behalf of the general public of the District, appeal to the [BER] the assessment of any real property except Class 1 property, Class 2 property, or Class 3 property, or may intervene in any appeal brought by the owner of that property.

Mr. Hessey filed his initiative proposal [1] with the Board of Elections and Ethics ("the Board") on January 22, 1990. Several individual commercial property owners, the Apartment and Office Building Association of Metropolitan Washington, and the Washington Association of Realtors (collectively "the opponents") promptly filed objections to the proposed Taxpayers' Act, arguing that it was not a "proper subject of initiative" under D.C.Code § 1–

---

1. D.C.Code § 1–1302(10) (1992) defines "initiative" as follows:

     The term "initiative" means the process by which the electors of the District of Columbia may propose laws (except laws appropriating funds) and present such proposed laws directly to the registered qualified electors of the

1320(b)(1).[2] The opponents advanced seven grounds before the Board for rejecting the initiative. The Board held a hearing, and on March 7, 1990, it ruled that the Taxpayers' Act was not a proper subject. In its order the Board relied on two of the grounds presented by the opponents,[3] but it expressly refused to rule on the other five.

Mr. Hessey then brought an action in the Superior Court, seeking a writ in the nature of mandamus to compel the Board to accept the proposed Taxpayers' Act.[4] The opponents filed a motion to intervene in the Superior Court proceedings, which was granted. Mr. Hessey then filed a motion for summary judgment, and the Board filed a cross-motion for summary judgment, in which the opponents joined. After a hearing, the court granted the Board's motion and denied Mr. Hessey's motion.

Mr. Hessey appealed, and in *Hessey I* this court reversed the decision of the Superior Court, holding that the two grounds relied upon by the Board and the trial court in rejecting the initiative were insufficient to make the proposed measure an improper subject under D.C.Code § 1–1320(b)(1). Our opinion stated simply that the judgment of the trial court was "reversed." *Hessey I, supra,* 584 A.2d at 8. The oppo-

nents filed a timely petition for rehearing en banc, thereby staying issuance of our mandate. *See* D.C.Ct.App.R. 41(a).

Shortly after the opinion in *Hessey I* was issued, the Board, without waiting for a ruling on the petition for rehearing en banc, prepared a short title and summary statement of the proposed initiative pursuant to D.C.Code § 1–1320(c). The opponents then filed in the Superior Court a separate action against the Board challenging the short title and summary statement, in accordance with D.C.Code § 1–1320(e).[5] In their complaint, filed under the name of *Price v. Board of Elections,* the opponents sought "review" of the Board's latest action, as well as "injunctive, declaratory, and other relief." They argued that the Board had acted *ultra vires* in issuing the short title and summary statement because this court's mandate had been automatically stayed by the pending petition for rehearing en banc. *See* D.C.Ct.App.R. 41(a). The opponents also asserted that the Board should have rejected the initiative because it violated the constitutional guarantees of due process and equal protection, because it would result in an unconstitutional taking of private property, because it proposed a regulation rather than a "law," because it authorized unlawful discrimination in viola-

District of Columbia for their approval or disapproval.

2. D.C.Code § 1–1320(b)(1) requires the Board to reject an initiative proposal if it finds that the measure

is not a proper subject of initiative ... under the terms of title IV of the District of Columbia Self–Government and Governmental Reorganization Act, or upon any of [four other] grounds....

Title IV of the Self–Government Act is the District of Columbia Charter. See note 8, *infra.*

3. The Board held that the proposed initiative would violate the District of Columbia Charter's grant of power to the Mayor and would expand the jurisdiction of the courts.

4. D.C.Code § 1–1320(b)(3) provides in part:

If the Board refuses to accept any initiative ... submitted to it, the person or persons submitting such measure may apply, within 10 days after the Board's refusal to accept such measure, to the Superior Court of the District of Columbia for a writ in the nature of mandamus to compel the Board to accept

such measure.... If the [court] determines that the issue presented by the measure is a proper subject of initiative ... and that the measure is legal in form, does not authorize discrimination as prescribed in paragraph (1)(C) of this subsection, and would not negate or limit an act of the Council of the District of Columbia as prescribed in paragraph (1)(D) of this subsection, it shall issue an order requiring the Board to accept the measure.

5. D.C.Code § 1–1320(e)(1)(A) (1992) provides in part:

If any registered qualified elector of the District of Columbia objects to the summary statement, short title, or legislative form of the initiative measure formulated by the Board pursuant to subsection (c) of this section, that person may seek review in the Superior Court of the District of Columbia within 10 calendar days from the date the Board publishes the summary statement, short title, and legislative form in the District of Columbia Register and in a newspaper of general circulation....

tion of the District of Columbia Human Rights Act, and because it would negate or limit a budget act of the Council. These were the same five grounds which they had previously argued before the Board, but which the Board had expressly declined to consider when it had first ruled on the proposed initiative. Finally, the opponents alleged that the summary statement was inaccurate and biased. The Board filed an answer to the complaint in *Price*, and Mr. Hessey, after being granted leave to intervene, filed a motion to dismiss the complaint, or in the alternative for summary judgment.

The trial court then stayed further proceedings in *Price* because this court had not yet ruled on the petition for rehearing en banc in *Hessey I*. Mr. Hessey thereupon filed with this court an emergency motion in *Hessey I* for issuance of the mandate. On October 15, 1991, this court granted Mr. Hessey's motion, denied the petition for rehearing en banc, and issued the mandate.

Two weeks later, on October 29, the opponents filed in the trial court a "Motion for Further Proceedings on Plaintiff Hessey's Motion for Summary Judgment And On Intervenor Defendants' Further Bases for Rejecting Mr. Hessey's Initiative in *Hessey v. Burden.*" They asserted that this court in *Hessey I* had ruled on only the two grounds upon which the Board had rejected the proposed initiative, and that there had never been a ruling on any of the other five challenges which they had originally presented to the Board. The Board opposed this motion on the ground that the opponents had no standing to reopen the

case for additional findings. Mr. Hessey also opposed the opponents' motion to reopen, arguing that this court's ruling in *Hessey I* that the proposed initiative represented a proper subject was the law of the case. He also maintained that there was no longer any controversy between the Board and himself which would justify the reopening of the original case (*Hessey v. Burden*).

■ The trial court consolidated the two cases and, after a hearing, entered an order on November 21, 1991, concluding that further proceedings in *Hessey v. Burden* were necessary under D.C.Code § 1–1320(b)(3) because this court in *Hessey I* had decided only the two issues presented to it. After further briefing and argument, the court issued a memorandum opinion on January 28, 1992, holding that the section of the proposed initiative which would allow any taxpayer to appeal the assessment of any Class 4 or Class 5 property (but not the assessment of any Class 1, 2, or 3 property) was impermissible under D.C.Code § 1–1320(b)(1) because, if enacted, it would result in a denial of equal protection of the laws.[6] The court rejected the opponents' other arguments. Mr. Hessey and the opponents both appeal from the January 28 order.[7]

## II. PROCEDURAL ISSUES

### A. *The proper application of D.C.Code § 1–1320(b)*

Buried deep in the turgid prose of D.C.Code § 1–1320 are both the standard by which the Board of Elections determines a proposed initiative measure to be a prop-

---

**6.** Although the Equal Protection Clause of the Fourteenth Amendment does not apply to the District of Columbia, it is unquestioned that equal protection principles are embodied in the Due Process Clause of the Fifth Amendment, which does apply. *See Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

**7.** The opponents argue that Mr. Hessey has not preserved any right to appeal from the order of November 21, 1991, in which the court held that it had jurisdiction to reopen *Hessey v. Burden* for further proceedings. They assert that Mr. Hessey has appealed only from the order of January 28, 1992, which discussed the substan-

tive challenges to the proposed initiative. By failing to appeal separately from the November 21 order, they maintain, Mr. Hessey has waived any claim of error in that order. This argument has no merit. *See Sears, Roebuck & Co. v. Goudie,* 290 A.2d 826, 831 (D.C.), *cert. denied,* 409 U.S. 1049, 93 S.Ct. 523, 34 L.Ed.2d 501 (1972) ("after final judgment has been rendered ... prior provisional orders become effective as final orders, giving rise to appealability"). The opponents' assertion of prejudice resulting from a lack of specific reference to the order is equally unpersuasive. *See Foman v. Davis,* 371 U.S. 178, 181, 83 S.Ct. 227, 229, 9 L.Ed.2d 222 (1962).

er subject and the statutory grant of standing to the proponents of a Board-rejected initiative to seek judicial review of the Board's decision. The Board, as the body that takes the first step in the process by which initiatives are reviewed, must apply both the procedural and substantive provisions of section 1–1320(b). Our first task here is to give the Board, and future proponents and opponents of initiatives, some guidance on the procedural requirements of this densely written statute.

A review of what happened in the instant case illustrates well the inefficiency with which section 1–1320(b) has thus far been applied. Although the Board was faced in the earliest stages of this protracted dispute with seven challenges to the proposed initiative, it considered only two of those challenges when it ruled that the Taxpayers' Act was not a "proper subject" under section 1–1320(b). As a result of this partial ruling, the other five challenges made by the opponents were left in limbo while the Board's grounds for rejection of the initiative were considered by the Superior Court and then by this court in *Hessey I.* The opponents' motion to reopen the proceedings finally brought back from limbo the issues left unresolved by the Board (and consequently by the courts). The trial court was thus faced with a choice between (a) refusing to allow the opponents to assert potentially valid objections to the proposed initiative and (b) reopening a case which had already been through the courts once and was ready for the next step, whatever that might be. The trial court correctly chose option (b), but that choice prolonged the procedural odyssey on which this initiative has been forced to travel.

D.C.Code § 1–1320(b)(3) empowers the Superior Court, after the Board has rejected a proposed initiative measure, to decide whether that measure is a "proper subject of initiative ... under the terms of title IV of the District of Columbia Self-Government and Governmental Reorganization Act...."[8] It further provides that "[i]f the [court] determines that the issue presented by the measure is a proper subject of initiative ... it shall issue an order requiring the Board to accept the measure." We read this language as giving to the Superior Court the power to conduct its own independent, *de novo* examination of a proposed initiative once it has acquired jurisdiction of the case. The court is not limited to a mere review of the factors considered by the Board, although it may, and in most cases should, take those factors into account in making its decision.[9]

Since the Superior Court is thus empowered to determine independently whether a proposed initiative is a proper subject, it certainly could have reached all seven of the challenges to the Taxpayers' Act when it first considered that initiative. It appears from the record that the court was aware of at least some of them.[10] But no party really had any incentive to raise the unadjudicated claims before the court after the Board had made its ruling. The opponents had achieved their goal of persuading the Board that the proposed initiative was not a proper subject. They had successfully defeated the initiative with only two arrows; they were understandably content to leave the other five in their quiver for later use. It was likewise against Mr. Hessey's interest to call attention to the five remaining challenges, because to do so

---

**8.** Title IV of the Self–Government Act, which was enacted in 1973, is commonly known as the District of Columbia Charter. *See* Pub.L. No. 93–198, §§ 401–495, 87 Stat. 774, 785–812 (1973). It took effect on January 2, 1975, *id.* § 771(c), 87 Stat. 836, and is codified in scattered sections of the District of Columbia Code.

**9.** Our reading of this provision is reinforced by the fact that the court action is begun by the filing of an application for "a writ in the nature of mandamus," an original proceeding, rather than an "appeal" or a petition for "review" of the Board's decision. *Compare, e.g.,* D.C.Code

§ 1–606.3(d) (1992) (authorizing "appeal" to Superior Court from adverse decision by Office of Employee Appeals); D.C.Code § 47–3303 (1990) (authorizing any person aggrieved by a tax assessment to "appeal" to Superior Court).

**10.** Mr. Hessey's complaint contained a broad assertion that the initiative "meets all of the statutory requirements for acceptance by the Board, as set forth in D.C.Code § 1–1320...." The court also had before it a copy of the Board's order, which identified some—but not all—of the challenges raised by the opponents.

would invite the court to consider whether there were any other reasons why his initiative might not be a proper subject.

■ D.C.Code § 1–1320 sets up a procedure whereby the two principal actors in the drama, the Board and the Superior Court, perform their roles in sequence. Given this statutory scheme, we hold that the Board, in deciding whether to accept or reject a proposed initiative under D.C.Code § 1–1320(b)(1), should, in the great majority of cases, consider and rule on *all* challenges to the initiative when they are raised, regardless of the merits of any one. As the only neutral party in the debate over whether this particular initiative was a proper subject, the Board should have ensured that the court would consider all seven challenges at once. The Board could have accomplished that result by itself addressing all seven when the opponents first raised their challenges to the proposed initiative. We strongly urge the Board to follow such a course in the future, and to consider all the challenges to a proposed initiative when they are first presented so that the court, faced with a mandamus application under D.C.Code § 1–1320(b)(3), may have the benefit of the Board's thinking on each issue.. In this case, had the Board considered the opponents' seven challenges at the outset rather than just two, the protracted, tortuous litigation which has kept this initiative tied in knots for more than two years could have been avoided.[11]

## B. *The Board's misreading of Hessey I*

■ This case was also needlessly complicated by the Board's premature preparation of the summary statement, short title, and legislative form of the proposed initiative before all challenges to that initiative had been finally resolved. The Board erro-

neously read this court's opinion in *Hessey I* as holding conclusively that the proposed initiative was a "proper subject" under D.C.Code § 1–1320(b); as a result, it went on to formulate the summary statement, short title, and legislative form of the initiative in accordance with D.C.Code § 1–1320(c).[12] This interpretation of *Hessey I* simply ignored the fact that there were five more substantive challenges to the initiative which had not yet been adjudicated by the Board or by any court. Further court proceedings were surely foreseeable after our decision in *Hessey I*, and the Board's attempt to move the process along to the next step was unwarranted.

■ In *Hessey I* we reversed the Superior Court's determination that the initiative was not a proper subject on the two grounds asserted. That reversal, however, did not terminate the case. After an appellate reversal of its ruling, a trial court may take any affirmative action so long as that action is not inconsistent with the appellate decision. We made this clear more than forty years ago in *Pyramid National Van Lines, Inc. v. Goetze*, 66 A.2d 693 (D.C. 1949):

Where a judgment previously entered for a defendant is reversed without further order, the mandate to that effect does not preclude any other affirmative action unless specifically directed by the appellate court.... [T]he general rule is that the lower court is free to make any order or direction in further progress of the case not inconsistent with the appellate decision as to any question not presented or decided by such decision.

*Id.* at 694 (citation omitted); *see also Mutual Life Insurance Co. v. Hill*, 193 U.S. 551, 553–554, 24 S.Ct. 538, 539–40, 48 L.Ed. 788 (1904) ("the rule is that a judgment of

---

**11.** The Board was correct in concluding that any one successful challenge to a proposed initiative compels its rejection under D.C.Code § 1–1320(b). Nevertheless, the fact that one challenge will suffice does not prevent the Board from addressing all the others. Again we stress that the Board could have foreclosed the piecemeal review which resulted from its partial adjudication by going on to reach the other five challenges to the proposed Taxpayers' Act. At the very least, such action would have placed

· the Board's reasoning on all relevant issues on the record for consideration by the Superior Court.

**12.** Section 1–1320(c) requires the Board, within twenty days from the date on which it accepts an initiative, to prepare "a true and impartial summary statement" and "a short title for the measure," and to draft the measure itself "in the proper legislative form...."

reversal is not necessarily an adjudication by the appellate court of any other than the questions in terms discussed and decided"); 5B C.J.S. *Appeal & Error* § 1965 (1958). When a trial court judgment is reversed on appeal,

> such judgment is . . . set aside and no longer remains in existence. The parties are then restored to the position they held before the judgment was pronounced and must take their places in the trial court at the point where the error occurred, and proceed to a decision.

*Doughty v. State Department of Public Welfare,* 233 Ind. 475, 476, 121 N.E.2d 645, 646 (1954) (citation omitted). The trial court correctly relied on *Pyramid Van Lines* and *Doughty* in concluding that it had jurisdiction to reopen the case after the reversal in *Hessey I* and rejecting Mr. Hessey's argument to the contrary.

It was the Board, however, that threw the major monkey wrench into the works by reading our decision in *Hessey I* far too broadly. Contrary to the Board's view, in *Hessey I* we did not rule on any of the opponents' five remaining challenges to the initiative, nor did we hold that the Taxpayers' Act was a proper subject of initiative under section 1–1320(b). The effect of our decision in *Hessey I,* under *Pyramid Van Lines* and other precedents, was simply to return the proposed initiative to the trial court with implicit directions not to reject it on the two grounds on which it had relied earlier. The Board, however, jumped to the wrong conclusion and prematurely prepared the summary statement, short title, and legislative form, instead of waiting for the court to rule on the other five challenges. Because it did not wait, the opponents of the initiative were forced to file a second action (*Price v. Board of Elections*) contesting the summary statement, short title, and legislative form while simultaneously challenging the substance of the proposed initiative.

**13.** See note 4, *supra.*

**14.** See note 5, *supra.*

■ D.C.Code § 1–1320 plainly contemplates sequential, not simultaneous consideration of these matters; the question whether a measure is a "proper subject of initiative" should be answered in its entirety before the summary statement, short title, and legislative form are even prepared. Had the Board realized this, it surely would have addressed all seven challenges to the proposed initiative when they were first presented, and the trial court and this court presumably would have adjudicated all the challenges to the Taxpayers' Act when this case first came along two years ago. Our decision in *Hessey I* would thus have been the final word on whether the proposed measure was a proper subject. The Board's failure to consider all seven challenges in the beginning led to its later misstep after the reversal in *Hessey I;* in short, one mistake led to another. We hope that both can be avoided in future cases.

### III. THE OPPONENTS' STANDING

■ Mr. Hessey and the Board maintain that the opponents have no standing to raise additional substantive challenges to the proposed initiative under D.C.Code § 1–1320. They point out that section 1–1320(b)(3) [13] gives only the proponent of an initiative measure the right to contest in court the Board's refusal to accept it under subsection (b)(1). They assert that D.C.Code § 1–1320(e), which allows any voter to challenge the summary statement or short title of a proposed initiative,[14] does not authorize an individual voter to challenge the Board's determination that an initiative is a "proper subject." Consequently, Mr. Hessey and the Board contend, the opponents have no statutory standing to argue that the proposed Taxpayers' Act is not a proper subject of initiative. The premise of their argument is the notion that section 1–1320 is the exclusive source of standing to challenge proposed initiatives in the Superior Court.[15] We find

**15.** There is dictum to that effect in *Citizens Against Legalized Gambling v. District of Columbia Board of Elections & Ethics,* 501 F.Supp. 786, 789 (D.D.C.1980) (a party "can show no right to challenge the placement of an initiative on the

this premise flawed, for it ignores the Superior Court's statutory grant of general equity jurisdiction.

With minor exceptions not pertinent here, "the Superior Court has jurisdiction of any civil action or other matter (at law or in equity) brought in the District of Columbia." D.C.Code § 11–921(a) (1989).[16] We have always construed this grant of jurisdiction broadly, most notably in *Andrade v. Jackson*, 401 A.2d 990, 992 (D.C. 1979), in which we held that the Superior Court is "a court of general jurisdiction with the power to adjudicate *any* civil action at law or in equity involving local law" (emphasis added). We have upheld that court's exercise of equitable jurisdiction in a variety of contexts, even when statutes did not explicitly provide access to the Superior Court. *See District of Columbia v. Greater Washington Central Labor Council*, 442 A.2d 110, 117 (D.C.1982), *cert. denied*, 460 U.S. 1016, 103 S.Ct. 1261, 75 L.Ed.2d 487 (1983) ("Within the general equitable powers of the court is the authority to enforce orders of the Mayor and of administrative agencies"); *Felder v. Allsopp*, 391 A.2d 243, 245 (D.C.1978) ("The sole jurisdictional basis for ... an action where neither divorce nor custody is at issue would be the general equity jurisdiction of the trial court"); *Gredone v. Gredone*, 361 A.2d 176, 180 (D.C.1976) (court's authority to issue a writ of ne exeat has "a basis in the courts' inherent equitable powers"); *J.H. Marshall & Associates, Inc. v. Burleson*, 313 A.2d 587, 592 (D.C.1973) ("It has been held repeatedly that even in the absence of statutory enactments, a person engaged in the unlawful practice of law may be enjoined from conducting such activity"). The judicial policy of preventing duplicitous litigation has been cited by this court as a reason for the exercise of general equitable jurisdiction. *Apartment & Office Building Ass'n v. Washington*, 343 A.2d 323, 332 (D.C.1975) ("we hold that the trial court did not abuse its discretion in taking equitable jurisdiction in this case, particularly in light of the fact that the aforementioned legal remedy would entail a multiplicity of actions").

The case of *Hessey v. Burden* was not originally brought to the Superior Court under that court's general equity jurisdiction but, rather, under the specific provisions of D.C.Code § 1–1320(b)(3). Once it was there, however, the court had jurisdiction, as a court of equity, to consider the opponents' remaining challenges to the proposed initiative. Moreover, in the *Price* case the opponents were equity plaintiffs, seeking *inter alia* a ruling by the court that the Taxpayers' Act was not a "proper subject of initiative" under D.C.Code § 1–1320(b). In asking for a declaratory judgment to that effect, they sought no more from the court than they had originally sought before the Board. We hold that the opponents had standing to invoke the court's equity jurisdiction, either as intervenors in the *Hessey* case or as plaintiffs in the *Price* case.

---

16. Section 11–921(a) was enacted in 1970 as part of the District of Columbia Court Reorganization Act, Pub.L. No. 91–358, § 111, 84 Stat. 473, 484 (1970). Section 1–1320 was enacted in 1979 as part of the Initiative, Referendum, and Recall Procedures Act, D.C.Law No. 3–1, 25 D.C.Reg. 9454 (1979). Nothing in the latter Act purported to repeal section 11–921(a), and it is "a cardinal principle of [statutory] construction that repeals by implication are not favored." *United States v. Borden Co.*, 308 U.S. 188, 198, 60 S.Ct. 182, 188, 84 L.Ed. 181 (1939) (citations omitted). In this case and generally, we are obliged to read both statutes together and "to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974).

ballot other than the right established by statute"), but that case is not binding on us. *See M.A.P. v. Ryan*, 285 A.2d 310, 312 (D.C.1971). We cited *Citizens Against Legalized Gambling* in *Davies v. District of Columbia Board of Elections & Ethics*, 596 A.2d 992 (D.C.1991), in holding that D.C.Code § 1–1320(*o*) "sets forth explicitly the method by which an initiative petition circulated for signatures and accepted by the Board for filing may be challenged," and that this "is the only permitted means for doing so." *Id.* at 994. But entertaining the petition for review in *Davies* would have ignored a clear violation of the administrative procedures which conditioned the right of review. In this case, as we shall see, there is no such conflict between the initiative statute and permitting the opponents to invoke the general equity jurisdiction of the Superior Court.

## IV. RIPENESS OF THE OPPONENTS' CONSTITUTIONAL CLAIM

Mr. Hessey and the Board argue that the constitutional objections to the proposed initiative raised by the opponents are not ripe for review because the initiative has not yet been enacted and, indeed, may be rejected by the voters. They liken the trial court's pre-election adjudication of the opponents' constitutional claims to an advisory opinion, which courts do not generally have the authority to issue. *See Smith v. Smith*, 310 A.2d 229, 231 (D.C.1973). The opponents contend, in response, that D.C.Code § 1–1320(b)(3) requires the trial court to consider constitutional objections to the proposed initiative before it is placed on the ballot. They point out that subsection (b)(1) requires an initiative measure to be "a proper subject of initiative ... under the terms of [the District of Columbia Charter]" (see notes 2 and 8, *supra*). Since the Charter provides in part that all legislation in the District of Columbia must be "consistent with the Constitution of the United States," D.C.Code § 1–204 (1992), the opponents argue that the initiative statute requires that all proposed subjects of initiatives be constitutional. That requirement, in the view of the opponents, compels a pre-election decision on the constitutionality of a proposed initiative.[17]

Our case law does not answer the ripeness question presented in this case. The United States District Court for the District of Columbia, in an unpublished opinion, has held that "[n]either the validity nor the constitutionality of the initiative ... may properly be resolved by this court. Those issues will be ripe for adjudication only if the initiative in fact passes and becomes law." *Grano v. Barry*, C.A. No. 83–2225 (D.D.C.1983), quoted in *Grano v. Barry*, 251 U.S.App.D.C. 289, 292, 783 F.2d 1104, 1107 (1986). Mr. Hessey cites several unpublished Superior Court decisions in arguing that the opponents' constitutional claim is unripe. This court's only discussion of ripeness in the realm of constitutional challenges to proposed initiatives, however, came in a footnote in *Convention Center Referendum Committee v. District of Columbia Board of Elections & Ethics*, 441 A.2d 889, 898 n. 17 (D.C.1981) (en banc) (plurality opinion), where we simply noted the conflicting authority in other jurisdictions on the ripeness issue, which was not actually before us in *Convention Center*.

In most other jurisdictions, the general rule with respect to pre-election review of proposed initiatives is that constitutional challenges are unripe. The Supreme Court of Colorado, for instance, has said that courts may not

> interfere with the exercise of this right [of initiative] by declaring unconstitutional or invalid a proposed measure before the process has run its course and the measure is actually adopted.... Then and only then, when actual litigants whose rights are affected are before it, may the court determine the validity of the legislation.

*McKee v. City of Louisville*, 200 Colo. 525, 528–29, 616 P.2d 969, 972–973 (1980) (citations omitted). The Supreme Court of Oregon has held:

> "If [a proposed initiative] is unconstitutional and should be adopted, the Constitution itself will require the courts, if the question is properly presented, to pronounce the measure to be unconstitution-

---

**17.** The opponents point out that this court, an Article I court, is not bound by constitutional concerns of ripeness, mootness, and justiciability. They are, of course, correct. *See Atchison v. District of Columbia*, 585 A.2d 150, 153 (D.C. 1991). But this court, while acknowledging that it is "not bound by the requirements of Article III," nevertheless "has followed the principles of standing, justiciability, and mootness to promote sound judicial economy and has recognized that an adversary system can best adjudicate real, not abstract, conflicts." *District of Columbia v. Walters*, 319 A.2d 332, 338 n. 13 (D.C.) (citations omitted), *cert. denied*, 419 U.S. 1065, 95 S.Ct. 650, 42 L.Ed.2d 661 (1974). At the same time, we do enjoy some "flexibility ... not possessed by the federal courts." *Atchison, supra*, 585 A.2d at 153 (footnote omitted). Aware of that flexibility, and recognizing that "the scope of the issues raised in this appeal extends well beyond the rights of the specific parties," *Pendleton v. District of Columbia Board of Elections & Ethics*, 449 A.2d 301, 303 n. 1 (D.C.1982) (citations omitted), we exercise our discretion to address the ripeness issue.

al, but the courts possess no such power as to any proposed bill before the same has become a law...."

*Johnson v. City of Astoria*, 227 Or. 585, 589, 363 P.2d 571, 575 (1961), quoting *State ex rel. Carson v. Kozer*, 126 Or. 641, 649, 270 P. 513, 516 (1928). The same rule applies in Ohio:

It is well-settled that this court will not consider, in an action to strike an issue from the ballot, a claim that the proposed amendment would be unconstitutional if approved, such claim being premature.

*State ex rel. Cramer v. Brown*, 7 Ohio St.3d 5, 6, 454 N.E.2d 1321, 1322 (1983) (citations omitted); *see also Diaz v. Board of County Commissioners*, 502 F.Supp. 190, 193–194 (S.D.Fla.1980); *State ex rel. Williams v. Iannucci*, 39 Ohio St.3d 292, 530 N.E.2d 869 (1988); *Drockton v. Board of Elections*, 16 Ohio Misc. 211, 216, 240 N.E.2d 896, 901 (C.C.P.1968); *In re Initiative Petition No. 348*, 820 P.2d 772, 782 (Okla.1991) (Opala, C.J., concurring); *Coalson v. City Council of Victoria*, 610 S.W.2d 744, 747 (Texas 1980); *State ex rel. Althouse v. City of Madison*, 79 Wis.2d 97, 102–103, 255 N.W.2d 449, 455–456 (1977). Moreover, any court ruling on the validity of a proposed initiative may be perceived as "an unwarranted judicial intrusion into a legislative process." Gordon & Magleby, *Pre-Election Judicial Review of Initiatives and Referendums*, 64 NOTRE DAME L.REV. 298, 304 (1989). Judges who strike a legislative proposal from the ballot before the voters have a chance to vote on it "could be perceived, at least by the measure's supporters, as meddlers interfering with the process of popular legislation." *Id.* at 306.

Some courts nevertheless have ruled on constitutional challenges to proposed initiatives before those initiatives have been enacted into law. In proceedings to compel elections, several courts have "look[ed] into the question whether, if approved by the voters, the measure would be valid." *West Hartford Taxpayers Ass'n v. Streeter*, 190

Conn. 736, 739, 462 A.2d 379, 382 (1983) (citations omitted). The Kentucky Court of Appeals takes the position that "in a proper case validity of a proposed legislative enactment may be determined before actual adoption in a proceeding to compel or to prevent its submission to a required referendum where the public interest requires prompt decision, or it is necessary to a decision of the case in hand, such as the right to the issuance of a writ of mandamus." *Utz v. City of Newport*, 252 S.W.2d 434, 437 (Ky.1952) (citation omitted); *see also Whitson v. Anchorage*, 608 P.2d 759, 762 (Alaska 1980); *AFL–CIO v. March Fong Eu*, 36 Cal.3d 687, 695–697, 686 P.2d 609, 614–615, 206 Cal.Rptr. 89, 94–95 (1984); *State ex rel. Steen v. Murray*, 144 Mont. 61, 65, 394 P.2d 761, 765 (1964).

The courts that engage in pre-election review of proposed initiatives generally justify such review on the ground that the electorate has no right to enact an unconstitutional law. They hold that the initiative right, as closely guarded as it is, does not extend to legislation which violates the United States Constitution or that of the state involved. *See Whitson, supra*, 608 P.2d at 762. Efficiency and fiscal responsibility are also put forth as reasons for pre-election review: "The court ought not to compel the doing of a vain thing and the useless spending of public money." *Utz, supra*, 252 S.W.2d at 437. Holding an election on an unconstitutional initiative would clearly be inefficient in hindsight, although that inefficiency must be weighed against the cost in judicial resources of pre-election review.[18]

Several of the cases cited above allow pre-election consideration of constitutional challenges to proposed initiatives if those initiatives cross a threshold of patent unconstitutionality. The *Whitson* case, on which the trial court principally relied in deciding that the constitutional issues in this case were indeed ripe for review, establishes a threshold test:

They liken the vote on such measures to political speech, protected by the First Amendment. *See* Gordon & Magleby, *supra*, 64 NOTRE DAME L.REV. at 312.

---

**18.** Professors Gordon and Magleby argue that the public's voting on unconstitutional measures serves the valuable goal of "expressing popular will and sending messages to government."

In the case of explicit constitutional prohibitions against proposed initiatives, we have noted that "[u]nless the courts had power to enforce those exclusions, they would be futile...." Similarly, where, as here, a municipal charter amendment proposed by initiative is in clear conflict with a state statute, it would be useless [to allow an election on the measure].

*Whitson, supra,* 608 P.2d at 762 (citations omitted); *see also State ex rel. Steen v. Murray, supra,* 144 Mont. at 65, 394 P.2d at 765 ("purported Initiative Measure No. 63 seems almost designedly drafted to be unquestionably and palpably unconstitutional on its face"). This threshold showing of patent unconstitutionality would also justify pre-election review in Florida, which otherwise has abided by the general ripeness prohibition against such review. *Dulaney v. City of Miami Beach,* 96 So.2d 550, 551 (Fla.Dist.Ct.App.1957) ("An election should not be held if the ordinance proposed was clearly invalid on its face").

■ In the instant case, the trial court held that the opponents' constitutional claims were ripe for review even before the proposed initiative was placed on the ballot. The court accepted the opponents' argument that the initiative statute, with its reference to the District of Columbia Charter, compels pre-election review of the constitutionality of a proposed initiative. We do not agree that the statute requires either the Superior Court or the Board to entertain and rule on constitutional challenges before an election. While we recognize that the District's legislative power is unlike that of any state government because the District of Columbia is a "unique political entity," *In re O.M.,* 565 A.2d 573, 583 (D.C.1989), *cert. denied,* 494 U.S. 1086, 110 S.Ct. 1824, 108 L.Ed.2d 953 (1990), we do not think that power is as limited as the opponents suggest. We are therefore not persuaded that D.C.Code § 1–1320(b) requires that all legislation enacted by initiative be held constitutional by either the Board or the Superior Court before that initiative may be classified as a "proper subject."

■ Nevertheless, we stop short of joining the list of jurisdictions which forbid pre-election review of constitutional challenges to proposed initiatives. We agree with the majority of courts which hold that such review is imprudent. But there may be extreme cases in which it would be both appropriate and efficient to decide the constitutionality of a proposed initiative. An initiative proposing to establish an official religion in the District of Columbia, for example, would be patently unconstitutional. If someone proposed such a measure for submission to the voters, the Board and the Superior Court might well decide to classify it as an improper subject before public funds are spent on an election. Thus we are not willing to say that the Superior Court lacks jurisdiction to consider pre-election constitutional objections to an initiative. We think, however, that the court's jurisdiction should be very sparingly exercised, and that in the great majority of cases the court in its discretion should decline to consider pre-election challenges to the constitutionality or legality of an initiative. We are not prohibiting pre-election review of initiatives, but we are saying that, as a matter of trial court discretion, such review should be reserved for the truly extreme case.

■ The Superior Court's discretion to adjudicate constitutional challenges to proposed initiatives is based in part on the nature of a mandamus proceeding, the type of action authorized by D.C.Code § 1–1320(b)(3). When the proponent of an initiative petitions the court for a writ "in the nature of mandamus" to compel the Board to accept a proposed initiative, he or she is asking the court to bestow a kind of judicial blessing on that initiative. The request for such extraordinary relief requires and empowers the court to give the initiative a very close inspection and to consider every non-frivolous objection to it that has been properly raised. *See* 5 MCQUILLIN, MUNICIPAL CORPORATIONS § 16.69, at 324 (3d ed. 1989) ("it has been ruled that, *in a proceeding to compel submission to the electors,* in accordance with initiative procedure, a court will look into the question whether, if approved by the voters, the

measure would be valid and constitutional" (emphasis added)). But the court's discretion to rule (or not to rule) on constitutional objections to a proposed initiative is not tied exclusively to the *proponent's* petition for mandamus. As we have already held in part III of this opinion, the court may exercise its discretion to evaluate such constitutional claims before an election when it is acting within its general equity jurisdiction.

For these reasons we cannot say that the trial court in the instant case erroneously ruled on an unripe issue, though we emphasize again the court's discretion to refuse to decide a constitutional issue at this stage. We conclude that the court acted within its discretion, and within its statutory authority, in considering the opponents' challenges to the proposed initiative, and thus we turn to the merits of those challenges.

### V. IS THE PROPOSED INITIATIVE A "PROPER SUBJECT"?

The trial court concluded that the proposed initiative would violate the equal protection guarantee inherent in the Fifth Amendment but rejected the opponents' other arguments. We reverse the equal protection ruling, but otherwise affirm the trial court's decision.[19]

#### A. *Equal protection*

The parties do not dispute that the Taxpayers' Act is a piece of economic legislation. Such legislation "that does not employ suspect classifications or impinge on fundamental rights must be upheld against equal protection attack when the legislative means are rationally related to a legitimate governmental purpose." *Hodel v. Indiana,* 452 U.S. 314, 331, 101 S.Ct. 2376, 2386, 69 L.Ed.2d 40 (1981) (citations omitted). The Taxpayers' Act does not involve a suspect classification or any fundamental

right. It is thus entitled to "a presumption of rationality that can only be overcome by a clear showing of arbitrariness and irrationality." *Id.* at 331–332, 101 S.Ct. at 2386–2387. We hold that the opponents did not overcome that presumption, and that the trial court therefore erred in invalidating the initiative on equal protection grounds.

In deciding whether a challenged classification is rationally related to a legitimate governmental purpose, "we must answer two questions: (1) Does the challenged legislation have a legitimate purpose? and (2) Was it reasonable for the lawmakers [or, in this case, the proponents of the initiative] to believe that use of the challenged classification would promote that purpose?" *Western & Southern Life Insurance Co. v. State Board of Equalization,* 451 U.S. 648, 668, 101 S.Ct. 2070, 2082, 68 L.Ed.2d 514 (1981) (citations omitted).[20] If any reasonable basis for the initiative can be identified, we must reject the equal protection challenge, for "it has long been settled that a classification, though discriminatory, is not arbitrary nor violative of the Equal Protection Clause ... if any state of facts reasonably can be conceived that would sustain it." *Allied Stores of Ohio, Inc. v. Bowers,* 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480 (1959) (citations omitted); *accord, e.g., McGowan v. Maryland,* 366 U.S. 420, 426, 81 S.Ct. 1101, 1105, 6 L.Ed.2d 393 (1961). The fit between the classification's objective and its impact need not be perfect. "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970) (citation omitted). In short, anyone who challenges a discriminatory classification,

---

**19.** One of the opponents' arguments below was that the proposed initiative amounted to an unconstitutional taking of private property without due process of law. That argument was rejected by the trial court. Because it has not been renewed on appeal, we treat the taking issue as conceded.

**20.** The analysis applied to laws enacted by legislatures applies similarly to those enacted by referenda and initiatives. *See Convention Center, supra,* 441 A.2d at 907 (legislative power and initiative power are co-extensive).

other than one which is inherently suspect (*e.g.*, one based on race or religion), has a high hurdle to overcome in arguing that the classification is not at all related to a legitimate state purpose or jeopardizes the exercise of a fundamental right.

In the realm of tax classifications, the Supreme Court has held that the equal protection guarantee "applies only to taxation which in fact bears unequally on persons or property of the same class." *Charleston Federal Savings & Loan Ass'n v. Alderson*, 324 U.S. 182, 190, 65 S.Ct. 624, 629, 89 L.Ed. 857 (1945) (citations omitted). The Court has upheld the division of taxpayers into different classes and the assignment of different tax burdens to those classes, "so long as those divisions and burdens are reasonable." *Allegheny Pittsburgh Coal Co. v. County Commission*, 488 U.S. 336, 344, 109 S.Ct. 633, 638, 102 L.Ed.2d 688 (1989), citing *Allied Stores, supra*, 358 U.S. at 526–527, 79 S.Ct. at 440–441. So long as the classification of taxpayers "is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy," it will survive an equal protection challenge. *Brown–Forman Co. v. Kentucky*, 217 U.S. 563, 573, 30 S.Ct. 578, 579, 54 L.Ed. 883 (1910); *accord, e.g., Nordlinger v. Hahn*, —— U.S. ——, ——, 112 S.Ct. 2326, 2332, 120 L.Ed.2d 1 (1992). Mr. Hessey argues that his proposed initiative passes this test because it treats all taxpayers within Class 4 and Class 5 equally. He asserts that since the initiative's classification is not arbitrary, it satisfies the equal protection guarantee. The opponents, of course, claim that the initiative is unconstitutionally arbitrary.

The trial court agreed with the opponents that the proposed initiative was "arbitrary and irrational," and therefore unconstitutional. More specifically, the court concluded that the Taxpayers' Act was unconstitutional because there was no rational basis for making assessment appeals involving Class 4 and Class 5 properties, but not Class 1, 2, or 3 properties,[21] subject to public participation in the appeal process. Even allowing that there might be some justification for public involvement with respect to Class 4—namely, to ensure that the taxation of all property in the District of Columbia is based on its fair market value—the court ruled that the inclusion of Class 5 properties with Class 4 properties was arbitrary. The court also held that Mr. Hessey had not supported his claim of "increased complexity in determining fair market value" of Class 4 and Class 5 properties, and therefore that there was no rational basis for treating them differently from properties in Classes 1, 2, and 3.

In reviewing the trial court's decision, we accept Mr. Hessey's premise that "an initiative is subject to the same equal protection standards that apply to laws passed by the Council."[22] We are satisfied, after examining the proposed Taxpayers' Act, that it meets the two-part test for evaluating the constitutionality of economic legislation articulated by the Supreme Court in *Western & Southern Life Insurance Co., supra*. Every taxpayer has a financial interest in seeing that every other taxpayer's taxable property is not under-assessed. *Board of County Commissioners v. Buch*, 190 Md. 394, 397, 58 A.2d 672, 675 (1948). The asserted purpose for Mr. Hessey's proposed initiative, according to his brief, "is to ensure that owners of property in these two classes pay their fair share of taxes which can then be used for the delivery of much needed social and municipal services in the District." We agree with Mr. Hessey that this asserted purpose is consistent with that of the Council's own tax classification scheme.

In the trial court Mr. Hessey relied in part on a report issued by a committee of the Council which showed that the District of Columbia derived considerably less reve-

**21.** D.C.Code § 47–813(a) (1990) authorizes the Council of the District of Columbia to "establish different classes of real property" for tax purposes. Currently there are five such classes. Broadly speaking, Class 4 includes improved non-residential property other than hotels and motels (which are in Class 3), and Class 5 consists of unimproved non-residential property. *See* D.C.Code § 47–813(c–3) (1992 Supp.).

**22.** See note 20, *supra*.

nue in tax year 1991 from taxes on Class 4 and Class 5 property after the BER's review process than the Council had anticipated. *See* COUNCIL OF THE DISTRICT OF COLUMBIA, COMMITTEE ON FINANCE AND REVENUE, REPORT ON BILL 8–609, "REAL PROPERTY TAX RATES FOR TAX YEAR 1991 AMENDMENT ACT OF 1990," at 5 (1990). The discussion in this report of "[t]he District's revenue decline" as a result of appeals to the BER by Class 4 and Class 5 property owners provides a rational basis for grouping Classes 4 and 5 together and for not subjecting the other three classes of property to public involvement in the appeal process. Nothing more would be required to sustain the *Hodel* presumption of rationality if the Taxpayers' Act, differentiating between Classes 1, 2, and 3 and Classes 4 and 5, were enacted by the Council; hence nothing more is required to sustain the presumption when the Taxpayers' Act is proposed for enactment by initiative.

■ The proposed initiative is also supported by another legitimate governmental interest. Opening the assessment appeal process to more taxpayers and creating an Office of the Public Advocate would serve the important goal of citizen involvement in government and would be an important step toward curing the public perception of unfairness in the current closed system. Mr. Hessey cites a report by the District's Office of Campaign Finance as authority for his assertion that the public feels that commercial property is taxed at an unfairly low rate:

> [T]he manner in which the BER appears to have conducted its business has seriously undermined the public's confidence in that agency. There is a strong public perception that underassessment of commercial properties has substantially reduced the financial resources available to the District government, particularly at a time when the city is facing an unprecedented financial crisis.... Therefore,

we recommend ... public access to the hearing process....

DISTRICT OF COLUMBIA OFFICE OF CAMPAIGN FINANCE, FIRST COMPLIANCE REPORT, at 3 (April 16, 1991). This report officially recognizes that there is a public perception of unfairness in the assessment appeal process, even though that perception may or may not be founded in fact. The report concludes *inter alia* that "public access to the hearing process" would be rationally related to the goal of dispelling the public's mistrust. In short, the report identifies another legitimate purpose for the proposed initiative and demonstrates why the initiative would be rationally related to that purpose. Again, that is all that is needed to support the initiative under the *Hodel* presumption.[23]

■ The fact that public access to assessment appeals would be limited to cases involving Class 4 and Class 5 properties does not diminish the rational basis of citizen involvement in the assessment process. The initiative's underinclusiveness—*i.e.*, the inclusion of some classes of property, but not all, in opening the appeal process to the public—does not make it unconstitutional. "The State [is] not bound to deal alike with all these classes, or to strike at all evils at the same time or in the same way." *Semler v. Oregon State Board of Dental Examiners*, 294 U.S. 608, 610, 55 S.Ct. 570, 571, 79 L.Ed. 1086 (1935). Legislatures, and hence the people through direct legislation, may address problems in phases. "[R]eform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind." *Williamson v. Lee Optical of Oklahoma, Inc.*, 348 U.S. 483, 489, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955); *see also Bowen v. Owens*, 476 U.S. 340, 346–348, 106 S.Ct. 1881, 1885–1886, 90 L.Ed.2d 316 (1986); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 52–53, 106 S.Ct. 925, 931–932, 89 L.Ed.2d 29 (1986). The proposed initiative cannot be rejected on

---

23. So long as there is one legitimate state interest offered in support of the proposed initiative, it must be sustained in the face of an equal protection challenge. *See Dandridge v. Williams, supra*, 397 U.S. at 486, 90 S.Ct. at 1162

("We need not explore all the reasons that the State advances in justification of the regulation. It is enough that a solid foundation for the regulation can be found in the State's legitimate interest in encouraging employment ....").

equal protection grounds because it stops short of addressing the entirety of a legitimate state interest.

In sum, the trial court's conclusion that the proposed initiative violates the equal protection guarantee of the Fifth Amendment was erroneous because that conclusion was based on a limited view of the purpose of the initiative. The Supreme Court has created a heavy burden for challengers to economic legislation which does not depend on a suspect classification or implicate a fundamental right. Because the *Hodel* presumption of rationality has not been rebutted, we must reverse the trial court's constitutional holding.

### B. *Administrative or legislative?*

■■■■■ This court declared in *Convention Center, supra,* that "the power of the electorate to act by initiative is coextensive with the legislative power: an initiative cannot extend to administrative matters." 441 A.2d at 907 (citation omitted). To comply with this rule, an initiative measure must propose a "law"; it cannot be sustained if it is "administrative" in nature, *i.e.,* if it merely proposes to execute a law already in existence. An initiative will be deemed to be legislative in character if it "clearly includes an action which adopts a policy affecting the public generally and sets in motion the effectuation of that policy." *Woods v. Babcock,* 88 U.S.App.D.C. 37, 39, 185 F.2d 508, 510 (1950), *vacated as moot sub nom. City of Los Angeles v. Woods,* 340 U.S. 908, 71 S.Ct. 294, 95 L.Ed. 657 (1951). By contrast, an initiative is administrative if it "is merely by way of fact-finding in the course of effectuating a

policy declared by the legislature, or is merely the formulation of rules and regulations for the purposes of such effectuation...." *Id.* We adopted this distinction in *Convention Center, supra,* 441 A.2d at 909 n. 37.

■■■ The trial court, applying *Woods* and *Convention Center,* held that the proposed Taxpayers' Act was legislative in character because its provisions "are all new laws and policies." The opponents challenge this conclusion, arguing that the portions of the initiative which open the assessment process to the public and compel the release of tax information conflict with the confidentiality policy expressed in D.C.Code §§ 47–820(d) and 47–821(d)(2) (1990).[24] They maintain that the confidentiality statutes represent a legislative policy which the proposed initiative seeks to modify administratively.

The inconsistency between the proposed initiative and the confidentiality statutes does not make the proposed initiative administrative in character. To the contrary, that inconsistency demonstrates that the initiative seeks to establish a *new* legislative policy. The Council plainly has the power to do just that by enacting legislation which changes existing law. Since the initiative power is coextensive with the legislative power, the electorate, through the initiative process, may also enact such legislation. Thus the conflict between the proposed initiative and the two cited statutes does not invalidate the initiative.[25]

■■■ The opponents argue alternatively that because these two statutes deal with a

---

**24.** D.C.Code § 47–820(d) provides in part:
> The Council may adopt regulations regarding information to be furnished [to] the Mayor by owners of real property. Such regulations shall provide, under penalty of law, that all such information with respect to income derived from investment on [*sic* ] income-producing real property shall be handled in the same confidential manner as income tax returns....

D.C.Code § 47–821(d)(2) provides in part:
> All information submitted by a property owner to the Mayor regarding transfers of ownership, construction or reproduction costs, and income or economic benefits derived from real property in the District of

Columbia shall be accorded the same confidentiality as that applied to District of Columbia income tax returns....

**25.** The opponents cite *Jordan v. District of Columbia,* 362 A.2d 114 (D.C.1976), and *Goodwin v. District of Columbia Board of Education,* 343 A.2d 63 (D.C.1975), as authority for their assertion that the proposed initiative "would meddle with the details of existing policy." Those two cases are inapposite. They discuss the scope of statutes requiring public access to administrative hearings, but they say nothing about any proposed legislation; hence they have no bearing on this case.

"policy ... expressly committed to the regulatory and administrative power of the Mayor under D.C.Code § 47–820(f)," and because the Taxpayers' Act would directly affect that policy, the initiative is not a "proper subject" under D.C.Code § 1–1320(b)(1). We hold that a proposed initiative's inconsistency with the current District of Columbia Code has no bearing on the question of whether the proposed initiative is a "proper subject." Section 1–1320(b)(1) provides only that an initiative must be consistent with the District of Columbia Charter. Title 47 of the Code, dealing with "Taxation and Fiscal Affairs," is not part of the Charter. Any conflict between the terms of the initiative and any statute not part of the Charter is therefore irrelevant to the "proper subject" inquiry.

■ Even if we did consider the inconsistency between the Taxpayers' Act and the Code as relevant to the issue of whether the initiative is a proper subject, we would still reject the inconsistency claim in this case. The opponents argue that the proposed initiative is inconsistent with D.C.Code §§ 47–820(d) and 47–821(d)(2). They point to section 47–820(c), which authorizes the Council to adopt regulations concerning assessment of real property which "shall be consistent with the provisions of this chapter," as authority for their assertion that the Council cannot violate the policy of confidentiality in tax assessments. Since the Taxpayers' Act would clearly conflict with that policy, the opponents contend that it would be beyond the power of the Council to enact and hence is not a proper subject of initiative.

The opponents' argument rests on their assertion that the Council cannot enact a statute which would be inconsistent with the confidentiality provisions of Title 47. That assertion, however, is not correct. D.C.Code § 47–820(c) prevents the Council from adopting *regulations* affecting assessments which would conflict with the confidentiality policy. But that subsection does not, and could not, prevent the Council from changing the policy by enacting another statute. Thus the premise of the opponents' argument is simply wrong: section 47–820(c) does not preclude the Council from amending the confidentiality policy. Consequently, the proposed initiative, which would do just that, is not outside the realm of the Council's—and hence the electorate's—legislative authority.

### C. *The Human Rights Act*

D.C.Code § 1–1320(b)(1)(C) provides that a proposed initiative which "authorizes, or would have the effect of authorizing, discrimination prohibited under Chapter 25 of this title" cannot be a proper subject of initiative. Chapter 25 of title 1 of the Code contains the District of Columbia Human Rights Act. The opponents argue that the proposed initiative would violate that Act because it discriminates against the owners of Class 4 and Class 5 property, and that it is therefore not a proper subject of initiative under section 1–1320(b)(1). The trial court properly rejected this argument out of hand. The court analyzed the proposed initiative under three separate provisions of the Human Rights Act and correctly found that the initiative would violate none of the three.

■ D.C.Code § 1–2515 prohibits "unlawful discrimination in real estate transactions." The Human Rights Act defines "transaction in real property" as "the exhibiting, listing, advertising, negotiating, agreeing to transfer or transferring, whether by sale, lease, sublease, rent, assignment, or other agreement, any interest in real property or improvements thereon...." D.C.Code § 1–2502(30) (1992). We agree with the trial court that the proposed initiative, which deals with tax assessment procedures, "simply does not fit into the [statutory definition] of a transaction in real property."

■ The trial court also correctly ruled that the proposed initiative is not barred by D.C.Code § 1–2532, which prohibits "[a]ny practice which has the effect or consequence of violating any of the provisions of this chapter...." That section has been construed as banning discriminatory practices which bear disproportionately on members of a protected class. *Gay Rights Coalition v. Georgetown University*, 536

A.2d 1, 29 (D.C.1987) (en banc). Although the opponents contended that owners of income-producing property were a protected class,[26] the trial court disagreed. Even if the opponents were correct that owners of income-producing property were a protected class, the trial court held, and we agree, that the proposed initiative does not bear disproportionately on members of that class because Classes 2 and 3 also include income-producing property. Consequently, Class 4 and Class 5 property owners do not qualify as a protected class.[27]

■ Finally, the opponents claim that the proposed initiative would violate D.C.Code § 1–2525(a) (1992), which makes it unlawful "to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of ... any right granted or protected under this chapter."[28] They argue that Mr. Hessey's proposed initiative is designed to retaliate against the owners of large office buildings as a result of their success in tax assessment appeals. They state in their brief, "Mr. Hessey, and potentially others, do not like the idea that Class 4 and Class 5 owners successfully appeal their assessments, so in his initiative he attempts to create ways to interfere with their doing so and to retaliate against them for having done so in the past." The opponents assert that their right to be free from discrimination based on "source of income"[29] is threatened by the initiative's retaliatory purpose, and that the initiative is therefore barred by section 1–2525(a).

■ D.C.Code § 1–2525(a) prohibits retaliation against any person "in the exercise or enjoyment of" any right protected under the Human Rights Act. One who claims retaliation under this section, there-fore, must show *prima facie* that he or she has been discriminated against for "engag[ing] in a protected activity," *Goos v. National Ass'n of Realtors,* 715 F.Supp. 2, 3 (D.D.C.1989), or for exercising or enjoying a protected right. The opponents in this case have made no such showing. They claim that the proposed initiative will result in discrimination against them based on "source of income," but that claim is premature. They have not yet been injured by the Taxpayers' Act, and it is by no means certain that they ever will be. Even if public involvement in tax assessment appeals involving Class 4 and Class 5 properties leads to higher tax bills for the owners of such properties, the payment of additional taxes cannot be a cognizable injury if the tax is based on the value of the property. The initiative would only give the BER more information on which to base its assessments of Class 4 and Class 5 properties; it would not affect any property owner in any protected activity or in the exercise or enjoyment of any protected right. There is therefore nothing to which the opponents can tie their claim that the proposed initiative violates D.C.Code 1–2525. Their speculative charges about Mr. Hessey's motives for proposing the Taxpayers' Act are not substantiated, nor are they even relevant to the issue of whether the proposed initiative is a proper subject.

For these reasons we reject the opponents' assertion that the proposed initiative violates the Human Rights Act.

#### D. *Other issues*

■ There are two other matters which call for only brief discussion. First, the opponents argued in the trial court that the

---

26. The Human Rights Act prohibits discrimination against any person based on his or her "source of income." *See* D.C.Code § 1–2501 (1992) ("It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end ... to discrimination for any reason other than that of individual merit, including ... source of income ...").

27. The opponents also argued in the trial court that the proposed initiative violated D.C.Code §§ 1–2515 and 1–2532, two other provisions of the Human Rights Act. They do not press those arguments on appeal, and thus we regard them as abandoned.

28. Because this argument was made to the trial court, but was not decided, we deem it properly preserved for appellate review.

29. See note 26, *supra.*

proposed initiative, if enacted, would "negate or limit" a budget act of the Council [30] by forcing it to appropriate funds for the new office of the Public Advocate. The trial court summarily rejected that argument, noting that the Taxpayers' Act merely authorized the creation of an OPA but did not purport to allocate funds for it. The opponents have not pressed the point on appeal. We deem it waived.

▓▓▓▓ Second, the opponents contend that the initiative's provision allowing the OPA to appoint a staff conflicts with the Mayor's exclusive authority over District of Columbia government personnel. Because this contention was not made in the trial court, we will not entertain it. This court, and appellate courts generally, consistently refuse to consider arguments made for the first time on appeal. *E.g.*, *Chase v. Gilbert*, 499 A.2d 1203, 1209–1210 (D.C.1985); *District of Columbia v. Air Florida, Inc.*, 243 U.S.App.D.C. 1, 8–9, 750 F.2d 1077, 1084–1085 (1984); *Miller v. Avirom*, 127 U.S.App.D.C. 367, 369–370, 384 F.2d 319, 321–322 (1967). Only in "exceptional circumstances, where injustice might otherwise result," should an appellate court consider an issue not raised in the trial court. *District of Columbia v. Air Florida, Inc., supra*, 243 U.S.App.D.C. at 9, 750 F.2d at 1085; *accord, e.g., Kentucky v. Stincer*, 482 U.S. 730, 746 n. 22, 107 S.Ct. 2658, 2668 n. 22, 96 L.Ed.2d 631 (1987); *Hormel v. Helvering*, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037 (1941). We find no exceptional circumstances here. The opponents have had ample opportunity over the course of this already lengthy controversy to frame their challenges to the initiative. We will not consider this new argument, made for the first time after more than two years of litigation.[31]

## VI. CONCLUSION

Because it held that the Taxpayers' Act was not a proper subject for initiative under D.C.Code § 1–1320(b), the trial court did not reach the merits of the opponents' challenges to the Board's summary statement, short title, and legislative form. The trial court should now address those challenges, and we remand this case so that it may do so.

Given the tortuous path which this case has followed thus far, we think it appropriate to emphasize the limited nature of the court's task on remand. D.C.Code § 1–1320(b) is the only subsection of the Initiative Procedures Act in which the words "proper subject" appear. D.C.Code § 1–1320(e) does not permit substantive challenges to the proposed initiative; it merely authorizes judicial scrutiny of the Board's summary statement, short title, and legislative form. Proceedings under subsection (b) have ended; the case has now moved forward to subsection (e). The door is now closed to further substantive challenges to the initiative itself. On remand, therefore, the only matter properly before the court will be the opponents' challenge to the summary statement, short title, and legislative form.

We reverse that portion of the trial court's order of January 28, 1992, which held that the Taxpayers' Act violated the opponents' constitutional right to equal protection of the laws. In all other respects that order is affirmed. This case is remanded to the trial court for further proceedings consistent with this opinion.

---

**30.** D.C.Code § 47–304 (1990) directs the Council, within a prescribed time period, to adopt an annual budget for the District of Columbia government. If the Board finds that a proposed initiative measure would "negate or limit an act of the Council ... pursuant to § 47–304," it must refuse to accept the measure. D.C.Code § 1–1320(b)(1)(D) (1992).

**31.** Even if we were to consider this new argument, we would find it meritless. The assertion that the proposed initiative interferes with the Mayor's exclusive authority to hire and fire ignores this court's earlier interpretation of the initiative in *Hessey I*, where we held that the new Public Advocate would be "a subordinate of the Mayor," 584 A.2d at 4, subject to appointment and removal by the Mayor. As a subordinate, the Public Advocate could not preempt or interfere with the Mayor's control over government personnel.

*Affirmed in part, reversed in part, and remanded for further proceedings.*